**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| AMY CRANE, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:23-cv-93 (MTT) |
| | ) | |
| Nurse GINGER SKIPPER, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER**

In this 42 U.S.C. § 1983 action, plaintiff Amy Crane alleges that defendants Ginger Skipper, Linda Arnold, and Hannah Nolan were deliberately indifferent to Crane's serious medical needs.  Doc. 41.  Skipper, Arnold, and Nolan move for summary judgment arguing primarily that the undisputed facts establish that they were not deliberately indifferent to Crane's medical needs.[1]  Doc. 50.

**I. BACKGROUND[2]**

Crane was incarcerated at the Jones County Jail from June 9, 2022, until July 8, 2022, following her arrest on charges of felony child cruelty.  Docs. 50 at 2.  During her

---

[1] For reasons unclear, the defendants do not argue they are entitled to qualified immunity.

[2] Crane did not file a statement of material facts pursuant to Local Rule 56, and therefore, the facts in the defendants' statement are deemed admitted.  M.D. Ga. L. R. 56.  Still, the Court confirmed that the admitted facts were supported by the record by "review[ing] all of the evidentiary materials submitted in support of" the defendants' motion.  *United States v. One Piece of Real Prop'y*, 363 F.3d 1099, 1101-02 (11th Cir. 2004).  Further and although the Court advised Crane of her rights and obligations when responding to a motion for summary judgment (Doc. 52), Crane did not submit admissible evidence to support her claims.

intake, Crane refused to answer questions regarding her pregnancy status, medical conditions, and medications. Docs. 50-1 ¶¶ 5-10 at 2; 55 at 5; 50-2 at 94:1-98-5.

On June 10, 2022, the day after her arrest, Crane began having spotting issues and reported to the jailer that she was having a miscarriage. Docs. 50-1 ¶¶ 30, 32; 50-2 at 99:11–23. Within five minutes, she was seen by Skipper, a nurse employed by both the Jones County Sheriff's Department and Gray Family Health, a private health facility. Docs. 50 at 4; 50-2 at 102:17-103:2; 50-4 ¶¶ 4, 5. Crane told Skipper that she was spotting and that she believed she was having a miscarriage. Docs. 50-1 ¶ 37; 50-2 at 112:3 – 25, 118:1-119:1; 50-4 ¶ 6. Skipper asked Crane if she was sure that the spotting was not due to normal menstruation and if she wanted to take a pregnancy test to confirm. Docs. 50-1 ¶ 39; 50-2 at 112:23-113:6; 50-4 ¶ 7. Crane declined the pregnancy test and testified that she told Skipper that she had a positive pregnancy test two days before. Docs. 50-1 ¶ 38; 50-2 at 115:5-11. Crane testified that she was holding her legs together to keep blood from coming out but did not tell Skipper this. Docs. 50-1 ¶ 44; 50-2 at 118:15-24. There were no visible signs of bleeding during the visit, and Skipper did not perform a physical evaluation on Crane. Docs. 50-1 ¶ 45; 50-2 at 119:3-5, 14-16; 50-4 ¶ 8. The visit lasted less than five minutes.[3] Doc. 50-2 at 111:12-14. Crane testified that "me and Ms. Skipper, the only conversation we had was about the pregnancy test; and that was it. …That was it, the pregnancy test and the whole pregnancy issue. It was literally like two sentences that we spoke. That was it." Doc. 50-2 at 114:20-115:1.

---

[3] Crane testified that while she was with Skipper in the nurses' station, a male inmate started "banging on the door and … screaming" about Crane needing her heart medication. Doc. 50-2 at 105:15-17. Crane testified that when she communicated back to him, guards "rushed in" and she asked to be escorted back to her room. Docs. 50-1 ¶ 39; 50-2 at 115:19-22; 50-4 ¶ 7.

After being seen by Skipper, Crane claims that she continued to bleed heavily and asked a jailer if she could go to the hospital.  Docs. 50-1 ¶ 50; 50-2 at 121:13–23. Crane testified that a jailer told Crane the nurse had determined the bleeding was only her period, and they did not believe she was having a miscarriage.  Docs. 50-1 ¶ 52; 50-2 at 122:10–14.  A jailer continued to bring her sanitary products and uniforms to change into, and over the course of the night she changed uniforms five times.  Docs. 50-1 ¶ 53; 50-2 at 122:15-19.  Skipper was unaware of any bleeding which occurred after Crane's visit, and Crane testified that the jailers did not communicate with Skipper about Crane's subsequent bleeding.  Doc. 50-2 at 122:21-24.

Unrelated to her encounter with Skipper and in response to "numerous health complaints,"[4] Crane was transported from the jail to Gray Family Health on July 5, 2022. Doc. 151:18-152:3. Crane was seen by Nolan, a nurse practitioner employed by Gray Family Health, but did not report any bleeding or miscarriage, or that she had been pregnant.  Docs. 50-1 ¶¶ 69, 70; 50-2 at 156:2–4; 50-5 ¶ 13.  During this visit, Crane expressed concern over heart issues, swollen feet, breathing issues, and requested to see a cardiologist.  Docs. 50-1 ¶¶ 72, 73; 50-2 at 159:5–12, 161:11–13.  Nolan determined that Crane was medically stable, and it was not medically necessary for her to be referred for an urgent consult on July 5, 2022.  Docs. 50-1 ¶ 77, 50-5 ¶ 16. Arnold, a doctor and the owner and operator of Gray Family Health, never saw Crane but prescribed her four blood pressure medications: Metoprolol, Furosemide, Nifedipine, and Labetalol.  Docs. 50-1 ¶¶ 91, 92, 93; 50-2 at 154:6-15, 164:17-25; 50-6 ¶¶ 8, 10.

---

[4] Crane claims she submitted multiple grievances regarding her bleeding and alleged miscarriage, but only two grievances dated June 22 and June 24, 2022, are documented, neither mentioning pregnancy, miscarriage, bleeding, or high blood pressure.  Docs. 50-1 ¶ 56, 57; 50-2 at 127:23-128:21.  However, the defendants do not argue Crane failed to exhaust her administrative remedies.  Doc. 50.

Crane had no interactions with Arnold or Nolan at the Jones County Jail.  Docs. 50-1 ¶ 63; 50-2 at 145:18-21.

Crane filed this lawsuit in March 2023.  Doc. 1.  She claims that the defendants were deliberately indifferent to her serious medical needs and seeks damages for mental and emotional harm, physical pain, and the cost of a hysterectomy.[5]  Doc. 41.

## II. STANDARD

A Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[]—that is, point[] out to

---

[5] Crane testified that she is "abandoning" her claim for the cost of a hysterectomy because she cannot go under anesthesia.  Doc. 50-2 at 178:23-179:1.

the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id*. at 1438 (quoting *Celotex*, 477 U.S. at 324) (alterations in original). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id*.

The burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact." *Id*. (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), "the court may … consider the fact undisputed for purposes of the motion[.]" Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

Crane alleges that the defendants were deliberately indifferent to her serious medical needs in violation of the Fourteenth Amendment. Doc. 41. The defendants move for summary judgment on the grounds that Crane cannot establish (1) a substantial risk of serious harm, (2) that the defendants acted with deliberate indifference, or (3) that the defendants' conduct caused Crane's alleged injuries. Doc. 50 at 13. The defendants also argue that Nolan and Arnold are entitled to summary

judgment because they are non-state actors, and that Crane's claims against Nolan should be dismissed due to Crane's failure to make timely service on Nolan.  *Id*. at 19.

Pretrial deliberate indifference claims are brought under the Due Process Clause of the Fourteenth Amendment but are subject to the same scrutiny as Eighth Amendment deliberate indifference claims.  *Kenyon v. Silverman*, No. 23-10235, 2024 U.S. App. LEXIS 13470 at *4, 2024 WL 2831719 (11th Cir. June 4, 2024) (citing *City of Revere v. Mass. Gen. Hosp*., 463 U.S. 239, 244 (1983)).  The cruel and unusual punishment standard of the Eighth Amendment requires prison officials to "ensure that inmates receive adequate … medical care."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  To prove a deliberate indifference to medical treatment claim, a plaintiff must show: (1) "an objectively serious medical need"; and (2) "that the prison official acted with deliberate indifference to that need."  *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004); *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).

As for the first prong, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (quotation marks and citation omitted). Further, the condition must be one that would pose a "substantial risk of serious harm" if left unattended.  *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003).  Demonstrating a defendant's deliberate indifference, the second prong, requires showing a "sufficiently culpable state of mind."  *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc) (quoting *Farmer v. Brennan*, 511 U.S. at 834).  To show a sufficiently culpable state of mind, a plaintiff must establish that the defendant (i) had subjective knowledge

of a risk of serious harm; (ii) disregarded that risk; and (iii) acted by conduct that reflects "subjective recklessness as used in the criminal law." *Id.* (quoting *Farmer*, 511 U.S. at 839).

Subjective knowledge requires that the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (citing *Farmer*, 511 U.S. at 837). "Whether a prison official had the requisite knowledge … is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. The trier of fact may, therefore, "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. The determination of whether a risk has been disregarded is objective: "the official must have responded to the known risk in an unreasonable manner." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (citation omitted). To establish that "the [official] acted with 'subjective recklessness as used in the criminal law'" requires proof "that the [official] was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm." *Wade*, 106 F.4th at 1255 (quoting *Farmer*, 511 U.S. at 839).

    *1. Crane's serious medical needs*

        a. Vaginal bleeding and alleged miscarriage

The defendants argue that Crane cannot establish that she had a serious medical need because she has not shown that she was pregnant or suffered a miscarriage while incarcerated at the Jones County Jail in June 2022. Doc. 50 at 15. A serious medical need is "one that has been diagnosed by a physician as mandating

treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill*, 40 F.3d at 1187 (quotation marks and citation omitted). Further, the condition must be one that would pose a "substantial risk of serious harm" if left unattended. *Farrow*, 40 F.3d at 1243.

Courts have held that "prolonged vaginal bleeding, particularly when accompanied by pain, is a serious medical condition that is indeed 'so obvious that even a lay person would easily recognized the necessity for a doctor's attention.'" *See Cooper v. Rogers*, 968 F. Supp. 2d 1121, 1131 (M.D. Ala.) (citing *Goebert v. Lee County*, 510 F.3d 1312, 1326-27 (11th Cir. 2007); *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010); *Archer v. Dutcher*, 733 F.2d 14, 17 (2nd Cir. 1984); *Pool v. Sebastian Cnty.*, 418 F.3d 934, 944-45 (8th Cir. 2005). While Crane has not presented any medical evidence that she was pregnant or suffered a miscarriage,[6] the Court assumes, without deciding, that the record as a whole, construed in the light most favorable to Crane, raises a question of fact as to whether Crane suffered from a serious medical need on June 10, 2022. That assumption, though, is based on the alleged heavy bleeding that occurred after Skipper saw Crane.

Crane testified that on June 10, 2022, she started spotting and told the jailer she was having a miscarriage. Docs. 50-1 ¶¶ 30, 32; 50-2 at 99:11–23. After she was escorted to the nurses' station, Crane expressed concerns to Skipper that she

---

[6] Before her incarceration at the Jones County Jail, Crane had experienced difficulties with vaginal bleeding with clots. *See generally* Doc. 50-1 ¶¶ 12-15, 29. One of Crane's treating physicians, Dr. Matovu, testified that a patient such as Crane with a history of uterine fibroids and taking Eliquis could increase the chances of that patient suffering from excessive menstrual bleeding and the passing of clots during the patient's menstrual cycle. Docs. 50-1 ¶ 114; 50-3 at 12:21-25, 13:1-2. Dr. Matovu also testified that it was probable that the cause of Crane passing clots in June, July, and August of 2022, was related to her uterine fibroids and use of anticoagulants rather than a miscarriage. Docs. 50-1 ¶ 126, 50-3 at 14:15–22.

experienced a miscarriage.  Docs. 50-1 ¶ 34; 50-4 ¶ 6; 50-2 at 112:3 – 25.  Skipper responded by asking if Crane wanted to take a pregnancy test.  Docs. 50-1 ¶ 39; 50-2 at 112:23-113:6; 50-4 ¶ 7.  Crane declined the pregnancy test and testified that she told Skipper she had a positive result on a pregnancy test two days before.  Docs. 50-1 ¶ 38; 50-2 at 115:5-11.  Crane testified that in her brief visit with Skipper, she was holding her legs together to keep blood from coming out.  Docs. 50-1 ¶ 44; 50-2 at 118:15-24. Crane testified that later that night, she continued to bleed heavily and asked the jailer if she could go to the hospital.  Docs. 50-1 ¶ 50; 50-2 at 121:13–23.  The jailer continued to bring her sanitary products and uniforms to change into, and over the course of the night she changed uniforms five times.[7]  Docs. 50-1 ¶ 53; 50-2 at 122:15-19.  Again, there is no evidence Skipper knew of events occurring after she saw Crane.

### b. High blood pressure

Nolan and Arnold do not argue that Crane's high blood pressure, "heart issues, swollen feet, and breathing issues," for which she sought treatment at Gray Family Health, do not constitute a serious medical need.  While the Court lacks precise information regarding Crane's medical history, it is clear from the record that she was prescribed four blood pressure medications,[8] and therefore her high blood pressure was a condition "that has been diagnosed by a physician as mandating treatment."  *Hill*, 40 F.3d at 1187 (quotation marks and citation omitted).  Therefore, the Court assumes,

---

[7] Crane's amended complaint also alleged that an inmate who cleaned Crane's room after the night of June 10, 2022, told several jailers that Crane needed to go to the hospital because "it wasn't a cycle" and "there was too much blood."  Doc. 41-1 at 1.

[8] Docs. 50-1 ¶¶ 91, 92, 93; 50-6 ¶¶ 8, 10.

without deciding, that Crane has sufficiently raised a fact issue as to whether her high blood pressure constituted a serious medical need.

### 2. Deliberate indifference

Crane alleges that Skipper was deliberately indifferent to her bleeding issues[9] and that Nolan and Arnold were deliberately indifferent in their treatment of Crane's high blood pressure.[10]  Doc. 41 at 1-2.  The defendants argue that Crane cannot prove that any of the defendants knew of and disregarded any risk of serious harm to Crane's health and safety.  Doc. 50 at 15.  Further, the defendants argue that Crane cannot establish that any of the defendants' actions or inactions caused or contributed to Crane's alleged injuries.  *Id.* at 17.  The Court agrees that there is no admissible evidence of injury resulting from the defendants' alleged acts or omissions.  However, even in the absence of injury, Crane possibly could recover nominal damages.  *Hoever v. Marks*, 993 F.3d 1353, 1361 (11th Cir. 2021).  Thus, the absence of injury is not enough for dismissal of Crane's claims.

### a. Skipper

Crane alleges that Skipper was deliberately indifferent to her prolonged vaginal bleeding on the night that Crane allegedly suffered a miscarriage.  Doc. 50-2 at 138:19-21; 141:3-5.  While the defendants' brief merely recites the favorable facts from the

---

[9] Although Skipper saw Crane again later in June, Crane testified that all her criticisms of Skipper's care relate to the June 10, 2022, visit on the night of the alleged miscarriage.  Docs. 50 at 5; 50-2 at 137:15 – 18; 138:18 – 21.  Crane believes that Skipper "should have acted faster with [her] situation."  Docs. 50 at 5; 50-2 at 187:8–10.

[10] While Crane's complaint states that Nolan was added to this lawsuit "for her failure to treat Crane's miscarriage and its symptoms," it is undisputed that Crane and Nolan never discussed any issues related to pregnancy or a miscarriage.  Docs. 41 at 2; 50-1 ¶¶ 69, 70; 50-2 at 156:2–4; 50-5 ¶ 13.  In addition, Crane testified that her claim against Nolan relates exclusively to Nolan's failure to report Crane's health issues to a doctor and failure to recognize that Crane was over-prescribed blood pressure medication.  Doc. 50-2 at 159:16-21.

night of June 10, 2022, the Court agrees that Crane has not shown that Skipper was subjectively aware of Crane's prolonged vaginal bleeding or alleged miscarriage. Crane testified that the conversation between her and Skipper was "like two sentences" and it was "only … about the pregnancy test … and the whole pregnancy issue." Doc. 50-2 at 114:20-115:1. Such a brief conversation would not have been sufficient to communicate the gravity of Crane's situation, especially when the information exchanged between Crane and Skipper is largely undisputed. Specifically, Crane told Skipper that she was spotting and that she was concerned she had a miscarriage; Skipper asked if she was sure and if she wanted to take a pregnancy test to confirm; Crane declined the pregnancy test[11] and asked to be escorted back to her room. Doc. 50-1 ¶¶ 34, 37, 38, 39.

Subjective knowledge requires that the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez*, 508 F.3d at 617 (citing *Farmer*, 511 U.S. at 837). It is clear from these facts that Skipper, responding to Crane's claim that she was pregnant and had a miscarriage, sought additional information and asked Crane whether she wanted a pregnancy test. Crane refused the pregnancy test. Skipper did not perform a physical evaluation and did not see any blood during Crane's brief visit, and Crane only said that she had experienced "spotting." Docs. 50-1 ¶¶ 37, 45; 50-2 at 118:1-119:5, 14-16; 50-4 ¶¶ 6, 8. Because Crane declined the pregnancy test and asked to be escorted back to her room after a shorter-than-five-minute consultation,

---

[11] Even if the Court accepts Crane's testimony that she told Skipper she had a positive pregnancy test two days prior, which Skipper disputes, the Court's analysis of subjective knowledge would not change. Docs. 50-1 ¶ 38; 50-2 at 115:5-11.

Skipper did not draw the inference from circumstantial facts, and therefore lacked knowledge, that Crane was experiencing prolonged vaginal bleeding or suffered a miscarriage.[12]  Even if Crane experienced bleeding after the brief visit with Skipper, it is undisputed that Skipper was not aware of any subsequent bleeding.  Because the serious medical risk was unknown to Skipper, the determination of whether she disregarded the risk is unnecessary.

b. Nolan

Crane maintains that she was evaluated by Nolan at Gray Family Health and detailed all her medical conditions and concerns to Nolan during the evaluation.  Doc. 41 at 2.  Crane alleges that Nolan should have reported Crane's heart issues, swollen feet, and her being on four different blood pressure medications to a doctor or to her superiors.[13]  Docs. 41 at 2; 50-2 at 158:13-25; 159:2-4; 160:22-25; 161:1-3.  But the record shows that Nolan responded reasonably to all concerns that Nolan actually observed during the visit with Crane.  Nolan observed that Crane had high blood pressure and was not taking her blood pressure medication because she was not also taking potassium.  Doc. 50-2 at 160:8-10; Doc. 50-5 ¶¶ 11, 14. Nolan prescribed Crane potassium.  Doc. 50-2 at 160:14-15; Doc. 50-5 ¶ 15.  She determined that Crane was medically stable, and that it was not medically necessary for Crane to be referred for urgent consultation.  Doc. 50-5 ¶ 16.  Further, Nolan confirmed that the blood pressure medications Crane was prescribed were medically necessary to help control Crane's

---

[12] *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge … is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").

[13] It is undisputed that Crane did not report any issues related to vaginal bleeding, pregnancy, or a miscarriage to Nolan.  Docs. 50-1 ¶¶ 69, 70; 50-2 at 156:2–4; 50-5 ¶ 13.

blood pressure while she was incarcerated at the Jones County Jail.  Doc. 50-5 ¶ 9.

The record reflects that Nolan provided reasonable medical care regarding Crane's high

blood pressure and the health issues she observed during the evaluation.[14]

### c. Arnold

Crane alleges that Arnold over-prescribed blood pressure medications and that

Arnold should not have prescribed Metoprolol to Crane.  Docs. 41 at 2; 50-2 at 166:4-7.

However, Arnold affirmed that the blood pressure medications she prescribed were

reasonable for a patient such as Crane who was suffering from high blood pressure and

the medications prescribed were medically necessary to help control her blood pressure

while she was incarcerated at the Jones County Jail.  Doc. 50-6 ¶¶ 11, 13.  In addition,

despite Crane's contentions, Dr. Matovu denies she ever told Crane that her blood

pressure medication was improper.  Doc. 50-3 at 19:4-11.  The essence of Crane's

claim against Arnold is that she disagreed with the course of treatment she received.

Such disagreement does not rise to the level of deliberate indifference to a serious

medical need.  "'A simple difference in medical opinion between the prison's medical

staff and the inmate as to the latter's diagnosis or course of treatment' does not support

a claim of deliberate indifference."  *Melton v. Abston*, 841 F.3d 1207, 1224 (11th Cir.

2016) (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  Deliberate

indifference is not established when an inmate receives significant medical care but

"may have desired different modes of treatment."  *Hamm v. DeKalb Cnty.*, 774 F.2d

1567, 1575 (11th Cir. 1985) (citations omitted).

---

[14] Deliberate indifference in the context of a claim of cruel and unusual punishment is marked by care "so grossly incompetent, inadequate, or excessive as to the shock the conscience or to be intolerable to fundamental fairness."  *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995) (citing *Rogers v. Evans,* 792 F'.2d 1052, 1058 (11th Cir. 1986)).

For the foregoing reasons, the motion for summary judgment on Crane's deliberate indifference claims is **GRANTED** as to all defendants.

### 3. State action

Arnold and Nolan argue that they are entitled to summary judgment because they are not state actors and did not act under color of state law.  Doc. 50 at 19.  "The Fourteenth Amendment, by its own language, applies solely to state action."  *Charles v. Johnson*, 18 F.4th 686, 693 (11th Cir. 2021) (internal citations omitted).  Section 1983 creates "a private right of action against those who violate the [constitutional] rights of others while acting 'under color of [law].'"  *Id*. at 693-94 (quoting 42 U.S.C. § 1983).  Because Arnold and Nolan are private individuals and not state actors, they cannot be held liable in a § 1983 suit unless their actions amount to state action.  The actions of private individuals may amount to state action when one of three tests is met: the "(1) public function test; (2) the state compulsion test; and (3) the nexus/joint action test."  *Willis v. University Health Services, Inc*., 993 F.2d 837, 840 (11th Cir. 1993) (citing *Nat'l Broadcasting Co., Inc. v. Com. Workers of America, AFL-CIO*, 860 F.2d 1022, 1026 (11th Cir. 1988)). Only in rare circumstances will one of these tests be met by a private party.  *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992).

Arnold and Nolan contend, without meaningful citation to authority, that Crane cannot prove Arnold and Nolan satisfy any of the tests for state action.  Doc. 50 at 19. They note that Arnold and Nolan are both employed by Gray Family Health and are not employed by, nor do they receive compensation from, the Jones County Sheriff's Department or the Jones County Jail.  Docs. 50-5 ¶ 6-8; 50-6 ¶ 5-7.  However, it is the context in which a provider performs services for the State, apart from the source of

remuneration, which determines whether their action amounts to state action.  *Dixon v. Baptist S. Med. Hosp*., No. 2:07-CV-662-TFM, 2010 U.S. Dist. LEXIS 7916 at *17, 2010 WL 431186 (M.D. Ala. Feb. 1, 2010) ("[P]rivate individuals are not converted to state actors merely because the State pays for their services or regulates them in some way.") (citing *West v. Atkins,* 487 U.S. 42, 56 n.15 (1988)).

Here, it is undisputed that Nolan and Arnold's actions took place at Gray Family Health and Crane did not have any interactions with Arnold or Nolan at the Jones County Jail.  Doc. 50-2 at 145:18-21.  But the Court lacks any further information regarding the relationship between Arnold, Nolan, Crane, and the State, such as whether Arnold and Nolan were under contract with the State or provided services based on referrals as independent contractors.  *See Dixon*, 2010 U.S. Dist. LEXIS 7916 at *18 (collecting cases and concluding that "[t]he vast majority of federal courts agree that treatment by a non-contract private physician, nurse or hospital upon referral or on an emergency basis does not satisfy the requirements for state action.").  The Court need not resolve this issue, because even assuming Arnold and Nolan acted under color of state law in providing services to Crane, Crane has nonetheless failed to come forward with facts demonstrating that Arnold or Nolan acted with deliberate indifference.[15]

## IV. CONCLUSION

For the reasons discussed above, the defendants' motion for summary judgment (Doc. 50) is **GRANTED**.

---

[15] Nolan also argues that she is entitled to summary judgment because Crane failed to serve Nolan within ninety days of filing the Amended Complaint.  Doc. 50 at 19.  Given the Court's conclusion that Nolan is entitled to judgment on the merits, the Court does not address that argument.

**SO ORDERED**, this 8th day of January, 2025.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT